# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| FOOD & WATER WATCH, INC., *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 14-cv-1547(KBJ) |
| THOMAS J. VILSACK, *in his official capacity as the U.S. Secretary of Agriculture*, *et al.*, | ) ) ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM OPINION

The Poultry Products Inspection Act ("PPIA"), 21 U.S.C. §§ 451-472 (2012), requires the United States Department of Agriculture ("USDA") to protect consumer health and welfare by ensuring that poultry products are wholesome and not adulterated, and are also properly marked, labeled, and packaged. *See* 21 U.S.C. §§ 451, 455, 457. To carry out this mission, the USDA's Food Safety and Inspection Service ("FSIS") has traditionally promulgated regulations that require federal inspectors to be stationed at fixed points along the slaughter lines within poultry-processing establishments and that also mandate that the federal inspectors themselves control and direct the inspection process, including using sight, touch, and smell to inspect each poultry carcass that travels down the line, with the assistance of the establishments' employees. *See* Modernization of Poultry Slaughter Inspection, 77 Fed. Reg. 4408, 4410 (proposed Jan. 27, 2012) (describing the traditional inspection system). As part of a recent effort to modernize the federal poultry inspection process, however, the FSIS has adopted a new

inspection system that permits the employees of poultry-processing establishments to take a more active role in the inspection process. *See* Modernization of Poultry Slaughter Inspection, 79 Fed. Reg. 49,566 (Aug. 21, 2014) (to be codified at 9 C.F.R. pts. 381 and 500) (describing the new inspection system).  Under the new National Poultry Inspection System ("NPIS"), far fewer federal inspectors need be stationed along the slaughter lines, and the employees themselves can conduct a preliminary screening of the carcasses before presenting the poultry to a federal inspector for a visual-only inspection. *See id.* at 49567.  Seeking to challenge these new inspection procedures, two individual-plaintiff poultry consumers and an organization, Food & Water Watch, Inc. (collectively, "Plaintiffs") have filed the instant action—accompanied by a motion for a preliminary injunction—against the USDA and its Secretary, the Deputy Under Secretary for Food Safety, the FSIS, and the Administrator of the FSIS (collectively, "Defendants").  (*See* Compl., ECF No. 1; Pls.' Mot. for Prelim. Inj. ("Pls.' Mot."), ECF No. 3.)  According to Plaintiffs, this Court should issue a preliminary and permanent injunction that prevents the USDA and FSIS from implementing the NPIS because the revised processing procedures are inconsistent with the PPIA and will ultimately result in the production of unsafe poultry products.  (*See* Compl. ¶ 1; Pls. Mot. at 10-13.)[1]

Before this Court at present is Plaintiffs' motion for a preliminary injunction. While this Court has no doubt about the sincerity of Plaintiffs' belief that the regulation adopting the NPIS is a bad rule that will lead to unwholesome poultry products, the Court is also fully cognizant of its limited power to address Plaintiffs' concerns under

---

[1] Citations to documents that the parties have filed refer to the page numbers that the Court's electronic filing system assigns.

the circumstances presented here.  That is, because Plaintiffs have filed this suit in a court of limited jurisdiction, they must demonstrate at the outset that they have, or will have, an injury-in-fact that is traceable to the actions of the Defendants and that relief from this Court can address.  This Court concludes that Plaintiffs have failed to mount this hurdle.  Whatever the merits of the allegation that the new poultry-processing regulation is a policy that the USDA should never have adopted, this Court finds that such "injury" is precisely the type of generalized grievance that Article III courts are not empowered to consider.  Consequently, Plaintiffs do not have standing to bring this lawsuit and the instant case must be **DISMISSED** in its entirety for lack of subject matter jurisdiction, as explained below.  A separate order consistent with this memorandum opinion will follow.

## I.     BACKGROUND

### A.      The Poultry Products Inspection Act And Its Regulations

The PPIA, which Congress enacted in 1957, establishes a scheme for federal inspection of poultry slaughterhouses.  The FSIS administers the PPIA, *see* 7 C.F.R. §§ 2.18(a)(1)(ii)(A), 2.53(a)(2)(i), and prior to the new rules that are the subject of this case, the FSIS's regulations provided for four inspection systems for poultry production, each of which required federal inspectors to be stationed within poultry-processing establishments in both an "offline" and an "online" capacity.  77 Fed. Reg. 4410.[2]  Under the traditional inspection rules, offline inspectors perform activities like verifying the establishment's adherence to food safety regulations, verifying the

---

[2] All four of the traditional inspection systems share the requirement of a significant federal presence, and the distinctions between the four inspection systems are irrelevant to the threshold standing question that is currently before the Court.

effectiveness of the establishment's sanitation procedures, and collecting samples for pathogen testing. *See id.* By contrast, online inspectors stand at fixed points along the slaughter line (after the viscera have been separated from the inside of the poultry carcass) and examine every carcass, with its viscera. *See id.*; 9 C.F.R. § 381.76(b); *see also* 21 U.S.C. § 455(b).[3]

Notably, under the traditional poultry inspection systems, online federal inspectors conduct "organoleptic" inspections of poultry carcasses and viscera, meaning that inspectors use sight, touch, and smell to examine the poultry carcasses, *see* 9 C.F.R. § 381.76 (effective to Oct. 21, 2014), and this inspection technique is employed primarily for the purpose of determining whether or not the processed poultry carcasses are "adulterated," 21 U.S.C. § 455(c). The relevant statutory section provides that poultry is adulterated if it "contains any poisonous or deleterious substance"; is "filthy, putrid, or decomposed"; "has been prepared, packed, or held under insanitary conditions"; "has died otherwise than by slaughter"; or "is for any other reason unsound, unhealthful, unwholesome, or otherwise unfit for human food." *Id.* § 453(g). If a federal inspector finds that a poultry carcass is adulterated within the meaning of the statute, the inspector "condemns" the carcass (*i.e.,* the carcass is "destroyed for

---

[3] With respect to the role of the online inspectors, the PPIA states that

> [t]he Secretary, whenever processing operations are being conducted, shall cause to be made by inspectors post mortem inspection of the carcass of each bird processed, and at any time such quarantine, segregation, and reinspection as he deems necessary of poultry and poultry products capable of use as human food in each official establishment processing such poultry or poultry products for commerce or otherwise subject to inspection under this chapter.

21 U.S.C. § 455(b).

human food purposes under the supervision of an inspector"). *Id*. § 455(c).[4] Conversely, if the federal inspector finds that a carcass is not adulterated, the inspector affixes an official inspection legend on the item or its container, labeling the poultry as "Inspected for wholesomeness by U.S. Department of Agriculture." *See* 21 U.S.C. § 457; 9 C.F.R. § 381.96. False or misleading labeling is proscribed by the PPIA. 21 U.S.C. § 457(c).

Significantly, the regulations that govern the traditional poultry inspection systems make clear that the poultry processing establishment's employees are not responsible for the "sorting" function—*i.e.*, "determin[ing] which eviscerated carcasses appear eligible to bear the mark of inspection, which carcasses contain removable defects correctable through trimming or reprocessing, and which carcasses must be condemned because of septicemic and toxemic animal diseases." 77 Fed. Reg. 4410. Rather, "sorting acceptable product from unacceptable product, finding defects, identifying corrective actions, and solving production control problems" is the duty of the online federal inspectors, and the poultry establishment merely provides "a helper to take such actions as directed by the online post-mortem inspector after the inspector has conducted the initial sorting activities." *Id*.

---

[4] In relevant part, the section of the PPIA that addresses the "Condemnation; appeal; reprocessing" of adulterated poultry carcasses reads as follows:

> All poultry carcasses and parts thereof and other poultry products found to be adulterated shall be condemned and shall, if no appeal be taken from such determination of condemnation, be destroyed for human food purposes under the supervision of an inspector: *Provided*, That carcasses, parts, and products, which may by reprocessing be made not adulterated, need not be so condemned and destroyed if so reprocessed under the supervision of an inspector and thereafter found to be not adulterated.

21 U.S.C. § 455(c).

### B.      Changes In The Federal Poultry Inspection System

The new inspection system that is at issue in the instant case—referred to throughout this opinion as "the NPIS"—substantially alters the traditional roles that online federal inspectors play vis-à-vis establishment employees in a manner that Plaintiffs argue is both inconsistent with the statutory scheme and potentially harmful to human health.  Specifically, as explained further below, the NPIS relieves federal inspectors of the duty to sort poultry carcasses—leaving that task to establishment personnel—and places only one online federal inspector at the end of the slaughter line to whom the sorted and reprocessed birds are presented for final inspection.  Although Plaintiffs characterize the NPIS as "an unprecedented elimination of inspection resources" (Compl. ¶ 1), in the agency's view, the restructured inspection roles means that "FSIS [can] assign fewer inspectors to online inspection, freeing up Agency resources to conduct offline inspection activities that are more important for food safety, such as verifying compliance with sanitation and [other] requirements, or conducting Food Safety Assessments[,]"  77 Fed. Reg. 4410-11.

The final rule states that the NPIS is the culmination of decades of agency research regarding effective poultry processing systems, and that the NPIS reflects an intentional shift of federal inspection resources away from *post*-processing organoleptic review of poultry carcasses—which the traditional poultry inspection system relies upon and which, according to the agency, made sense at a time "when visually detectable animal diseases were more prevalent and considered to be more of a concern than they are today," *id*. at 4411—and toward stricter *pre*-processing controls, which, the agency says, are more important than ever in detecting the kind of microbial contamination that causes food borne human illness today, *see id.*  Stated simply, since

at least the 1990s, the USDA has been concerned that the traditional poultry inspections

systems "obscure the proper roles of industry and inspection personnel[,]" and "require

FSIS to allocate significant inspection personnel resources towards inspection activities

to detect defects and conditions that present minimal food safety risks, thus limiting the

resources available for more important food safety-related inspection activities." *Id.* at

4410; *see also* Pathogen Reduction; Hazard Analysis and Critical Control Points

(HACCP) Systems, 60 Fed. Reg. 6774 (proposed February 3, 1995) (declaring that

"there is a critical gap" in the traditional inspection program because it "does not

directly target pathogenic microorganisms" or "make meat and poultry establishments

legally responsible for taking systematic, preventive measures to reduce or eliminate

the presence of pathogenic microorganisms in meat and poultry products").  Thus, the

FSIS has spent the better part of the past two decades developing and evaluating various

alternative poultry inspection systems designed to translate this new philosophy into

practice.  *Compare id.* (proposing a new inspection system in 1995) *with* 79 Fed. Reg.

49,566 (announcing final rule in 2014 and describing the agency's research and

development of the rule).

One of those initiatives is especially relevant here.  In 1996, the FSIS

promulgated a rule—entitled the "Pathogen Reduction/Hazard Analysis and Critical

Control Points" (HACCP) rule—that required poultry establishments to "develop and

implement a system of preventive controls to ensure that their products are safe" while

permitting "FSIS [to] verif[y] the adequacy and effectiveness of establishments'

HACCP systems."  77 Fed. Reg. 4413; *see also* Pathogen Reduction; Hazard Analysis

and Critical Control Point (HACCP) Systems, 61 Fed. Reg. 38,806 (July 25, 1996).  The

FSIS also developed the HACCP-Based Inspection Models Project ("HIMP")—a pilot project that was first implemented in a few volunteer poultry slaughter establishments. The HIMP pilot required establishment employees to perform all of the tasks related to sorting and addressing abnormal poultry carcasses, subject to mere "oversight" and "verification" by federal inspectors, and in this regard, was dramatically different than the traditional inspection systems.  *See Am. Fed'n of Gov't Emps., AFL-CIO v. Glickman* ("*AFGE I*"), 215 F.3d. 7, 9 (D.C. Cir. 2000).  That is, whereas under the traditional systems the federal inspectors are posted on the slaughter line to sort and inspect each carcass, under the HIMP pilot, the federal inspection role was limited to "observing establishment personnel as they process carcasses" and "randomly sampl[ing] and examin[ing] carcasses that have been passed to determine if the establishment is complying with the relevant performance standards."  *Id.* at 10.

In the year 2000, the D.C. Circuit held that the original HIMP model was inconsistent with the PPIA, *see AFGE I*, 215 F.3d at 11, and the FSIS returned to the drawing board.[5]  The agency then established and implemented of a modified HIMP pilot that, like the subsequent NPIS, permitted establishment employees to sort and

---

[5] The *AFGE I* case was a lawsuit brought by the American Federation of Government Employees ("AFGE"), several FSIS inspectors, and a public interest organization to enjoin the implementation of the new inspection program.  The plaintiffs argued that the USDA had exceeded its statutory authority in promulgating the new program; specifically, AFGE contended that the PPIA and the Federal Meat Inspection Act ("FMIA") require FSIS inspectors to inspect each and every carcass organoleptically (that is, rely on their own sight, touch, and smell to examine the head, viscera, and exterior of each carcass for sings of adulteration), not just oversee slaughterhouse employees performing the task.  The District Court for the District of Columbia (J. Lamberth) disagreed, reasoning that the word "inspection," as used in PPIA, does not "mandate[] a direct, physical examination of each carcass."  *Am. Fed'n of Gov't Employees, AFL-CIO v. Glickman*, No. 98-893, slip op. 1, 3 (D.D.C. Sept. 23, 1999).  Thus, the court found the USDA's inspection program to be a "rational policy judgment that lies well within the Secretary [of Agriculture's] discretion [under *Chevron*.]"  *Id.*  The plaintiffs appealed, and the D.C. Circuit reversed the District Court, finding that the government inspectors were in violation of their unambiguous statutory duties because "[t]o the extent federal employees are doing any systematic inspecting under the Models Project, they are inspecting people not carcasses."  *Am. Fed'n of Gov't Employees, AFL-CIO v. Glickman* ("*AFGE I*"), 215 F.3d. 7, 9 (D.C. Cir. 2000).

process the carcasses but required a federal inspector to examine each bird that the

employees processed.  This modified HIMP pilot survived subsequent judicial review,

see Am. Fed'n of Gov't Emps., AFL-CIO v. Glickman ("AFGE II"), 284 F.3d 125, 130-

31 (D.C. Cir. 2002)[6]; and the FSIS then expanded the program, implementing the

modified HIMP program in twenty young chicken slaughter establishments and five

young turkey slaughter establishments around the country, and collecting and analyzing

data from these test programs, see 77 Fed. Reg. 4414.  The agency formally presented

its evaluation of this data in a 2011 report that, as relevant here, concluded that "HIMP

has improved the safety of poultry products and increased overall consumer protection

while still ensuring carcass-by-carcass inspection of each eviscerated carcass."  Id.; see

also USDA, Evaluation of HACCP Inspection Models Project at 7 (Aug. 2011)

(hereinafter, "the 2011 HIMP Analysis") (explaining that "an inspection system based

on the HIMP system in which establishments are responsible for sorting and identifying

unacceptable carcasses and parts before an online FSIS inspector performs a visual

carcass-by-carcass inspection will ensure an equivalent, if not better, level of food

safety and other consumer protection").

    Thus, it was primarily on the basis of the agency's findings from its experience

with the HIMP pilot program that the FSIS issued a notice of proposed rulemaking in

2012 announcing the agency's consideration of the new "National Poultry Inspection

System" that Plaintiffs challenge in the instant action.  See 77 Fed. Reg. 4421 ("Based

---

[6] The D.C. Circuit held that the modified inspection model did not violate the PPIA because "the USDA is complying with the PPIA's requirement that 'the carcass of each bird processed' be inspected for adulteration."  AFGE II, 284 F.3d 130 (citing 21 U.S.C. § 455).  The AFGE II Court also noted that the modified HIMP was merely "a test program, a temporary measure intended as an experiment[,]" and that "our opinion today may not necessarily foreshadow the outcome of judicial review of such future regulations."  Id. at 130-31.

on the Agency's experience under HIMP and the improved performance related to food safety and non-food-safety standards and especially in reducing pathogen levels, FSIS is proposing . . . the New Poultry Inspection System.").  As mentioned above and as relevant here, the proposed changes to the regulations that govern poultry processing directly affected slaughter line procedures and included:  (1) a requirement that establishment personnel sort carcasses and present the finished poultry to one federal inspector at the end of slaughter line, and (2) an increase in the maximum line speed to 175 birds per minute.  An extended notice and comment period followed, along with meetings with consumer advocacy organizations, trade associations, and the National Advisory Committee on Meat and Poultry Inspection, *see* Modernization of Poultry Slaughter Inspection Proposed Rule; Extension of Comment Period, 77 Fed. Reg. 24,873 (Apr. 26, 2012); 79 Fed. Reg. 49570, and on August 21, 2014, the FSIS adopted a final NPIS-related rule, which went into effect on October 20, 2014, shortly after Plaintiffs filed the complaint and preliminary injunction in this case.  *See* 79 Fed. Reg. 49,566.  Notably, the final rule adopting the NPIS differs from the rule proposed during the notice and comment period in that the final rule increased the line speed to only 140 birds per minute, and the final rule made adoption of the NPIS system *optional*, insofar as it provided each establishment with an opportunity either to retain the traditional inspection system or to convert to the NPIS.[7]

---

[7] Defendants estimate that many of the young-chicken and turkey slaughter establishments "will find it in their economic interest to adopt the new inspection system" and thus will switch to the NPIS.  79 Fed. Reg. 49,629.

### C.    Plaintiffs' Alleged Interest In Challenging The NPIS

As mentioned, Plaintiffs vigorously object to the FSIS's promulgation of the

NPIS rules.  According to the complaint, Plaintiff "FWW is a national, non-profit,

public interest, consumer advocacy organization that works to ensure safe food and

clean water." (Compl. ¶ 5.)  A sworn declaration that Plaintiffs have submitted as an

exhibit to the preliminary injunction maintains that "FWW has worked on poultry

inspection issues . . . since its inception as an organization in November 2005" (Decl.

Patricia Lovera—Assistant Director of FWW—("Lovera Decl."), Ex. 6 to Pls.' Mot.,

ECF No. 3-6, ¶ 4), and that "[p]art and parcel [of FWW's] mission has been advocating

for strong federal inspection rules that comply with the [PPIA]" (*id.* ¶ 5).  Allegedly,

"FWW has advocated against HIMP and NPIS," and plans to continue advocating

against NPIS in the future.  (*Id.* ¶¶ 6, 10-13.)

Margaret Sowerwine, Jane Foran, Alina Pittman, and Wendy Davis are among

FWW's 70,000 members.  (*See* Compl. ¶ 6.)  These individuals are also people who

purchase and eat poultry.  (*See* Decl. Margaret Sowerwine ("Sowerwine Decl."), Ex. 3

to Pls.' Mot., ECF No. 3-3, ¶ 4; Decl. Jane Foran ("Foran Decl."), Ex. 2 to Pls.' Mot.,

ECF No. 3-2 ¶ 3; Decl. Alina Pittman ("Pittman Decl."), Ex. 5 to Pls.' Mot., ECF No.

3-5, ¶ 3; Decl. Wendy Davis ("Davis Decl."), Ex. 4 to Pls.' Mot., ECF No. 3-4 ¶ 3.)

Sowerwine, Foran, Pittman, and Davis assert that the UDSA inspection label on the

poultry sold in grocery stores means to them that someone in the federal government

has inspected the poultry and that it meets federal standards for safety and quality.  (*See*

Sowerwine Decl. ¶ 5; Foran Decl. ¶ 7; Pittman Decl. ¶ 5; Davis Decl. ¶ 4.)  Insofar as

the NPIS rules have altered the traditional post-mortem federal poultry inspection

process, Sowerwine, Foran, Pittman, and Davis are now purportedly worried that the

poultry products produced under NPIS rules do not meet federal safety standards and thus may make them and their family members sick.  (*See* Sowerwine Decl. ¶ 9; Foran Decl. ¶ 11; Pittman Decl. ¶ 9; Davis Decl. ¶ 8.)  These poultry consumers also state that, in order to avoid this perceived increased risk of illness, they will change their shopping habits and may stop eating poultry altogether.  (*See* Sowerwine Decl. ¶ 10; Foran Decl. ¶¶ 12-13; Pittman Decl. ¶ 10; Davis Decl. ¶ 9.)

In addition, Sowerwine, Foran, Pittman, and Davis claim that they were not aware of the possibility that the final NPIS rules would include a line speed of 140 birds per minute and an opt-in system.  (*See* Sowerwine Decl. ¶ 7; Foran Decl. ¶ 14; Pittman Decl. ¶ 11; Davis Decl. ¶ 10.)  These poultry consumers claim that, if they had been aware of these facts, they would have communicated their views to the agency on these points.  (*See* Sowerwine Decl. ¶¶ 11-12; Foran Decl. ¶¶ 14-15; Pittman Decl. ¶¶ 11-12; Davis Decl. ¶¶ 10-11.)  Moreover, if USDA had set up public meetings to discuss the NPIS in their communities, these poultry consumers claim that they would have taken advantage of that opportunity to express their objections to the NPIS orally. (*See* Sowerwine Decl. ¶ 13; Foran Decl. ¶ 16; Pittman Decl. ¶ 13; Davis Decl. ¶ 12.)

### D.    Procedural History

On September 11, 2014, Sowerwine, Foran, and FWW filed the instant complaint against Defendants to challenge implementation of the NPIS regulations.  (*See generally* Compl.)  The gravamen of their complaint is that the NPIS is "an unprecedented elimination of inspection resources for a secret set of young chicken and turkey slaughterhouses" that will ultimately "threat[en] public health and introduc[e] unwholesome poultry into interstate commerce."  (*Id*. ¶ 1.)  Even more specifically,

Plaintiffs argue that (1) the NPIS violates the PPIA because the NPIS eliminates inspection requirements that Plaintiffs believe are mandatory under the PPIA (*see* Compl. ¶ 187-209 (claims 1, 2, 3, 4, and 5)); (2) the NPIS violates the PPIA because the rules establishing the NPIS were finalized without opportunity for oral presentation of views (*see id.* ¶ 210-13 (claim 6)); and (3) the NPIS violates the APA both because the rules establishing the NPIS were finalized without adequate notice and opportunity for public comment and because the rules are arbitrary and capricious (*see id.* ¶ 214-20 (claims 7 and 8)). Plaintiffs not only request a permanent injunction, they also seek to enjoin all of Defendants' NPIS rules from taking effect preliminarily, while the Plaintiffs' legal action is being adjudicated. (*See generally* Pls.' Mot.)[8] Defendants have filed an opposition to Plaintiffs' motion for a preliminary injunction, arguing *inter alia* that "[P]laintiffs' allegations do not establish the necessary concrete and actual or imminent injury to confer Article III jurisdiction on this Court." (Defs.' Mem. in Opp. to Pls.' Mot. for Prelim. Inj. ("Defs.' Opp."), ECF No. 15, 11.) This Court held a hearing on Plaintiffs' motion on October 17, 2014. (*See* Minute Entry dated 10/17/14.)

## II.    LEGAL STANDARD

A party seeking a preliminary injunction "must establish [1] that [it] is likely to succeed on the merits, [2] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [its] favor, and [4] that an

---

[8] Plaintiffs request a preliminary injunction only with respect to claims 1, 2, 6, and 7. Plaintiffs explain that they do not seek a preliminary injunction for claims 3, 4, 5 and 8 because, in Plaintiffs' view, those particular claims involve an assessment of the agency's determination that its HIMP experience justified promulgation of the NPIS in a manner that would require this Court to examine the administrative record and possibly revisit issues of fact raised in *AFGE II*. (*See* Pls.' Mot. at 10 n.1.) *See also supra* n.6. In other words, because Plaintiffs believe that claims 3, 4, 5, and 8 "would be better suited for disposition after the Court has a complete administrative record" (Pls.' Mot. at 10 n.1), their preliminary injunction motion relates only to the complaint's purely statutory claims.

injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  "Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered."  11A Charles Alan Wright, Arthur Miller, & Mary Kane, Federal Practice & Procedure § 2948.1 (3d ed.).  Thus, "a movant must demonstrate at least some injury for a preliminary injunction to issue," and "[a] movant's failure to show any irreparable harm is . . . grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (internal quotation marks and citation omitted).

The requirement of injury is also essential to a plaintiff's ability to sustain an action in federal court, even when no emergency or preliminary relief is being requested.  This is because, as explained below, a plaintiff in a federal lawsuit must have "standing" to sue—a status that is based in part on a legally redressable injury-in-fact—and the lack of standing is a defect that relates directly to a federal court's subject matter jurisdiction.

Stepping back briefly to explain the foundations of the standing requirement, it is well established that the Constitution's "Cases" and "Controversies" limitation, U.S. Const. art. III § 2, cl. 1, has two purposes: "[i]n part those words limit the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process.  And in part those words define the role assigned to the judiciary in a tripartite allocation of power to assure that

the federal courts will not intrude into areas committed to the other branches of government." *Flast v. Cohen*, 392 U.S. 83, 95 (1968).  The standing doctrine is primarily rooted in the concern for maintaining the separation of powers.  *See generally* Antonin Scalia, "The Doctrine of Standing as an Essential Element of the Separation of Powers," 17 Suffolk U. L. Rev. 881 (1983).  In this sense, the standing requirement acts as a gatekeeper, opening the courthouse doors to narrow disputes that can be resolved merely by reference to facts and laws, but barring entry to the broad disquiets that can be resolved only by an appeal to politics and policy.

    The constitutional component of standing has three elements:

> First, the plaintiff must have suffered an injury[-]in[-]fact—
> an invasion of a legally protected interest which is (a)
> concrete and particularized, and (b) actual or imminent, not
> conjectural or hypothetical.  Second, there must be a causal
> connection between the injury and the conduct complained
> of—the injury has to be fairly traceable to the challenged
> action of the defendant, and not the result of the independent
> action of some third party not before the court.  Third, it
> must be likely, as opposed to merely speculative, that the
> injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks, alterations, and citations omitted).  Put another way, "the standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf."  *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

    A plaintiff "bears the burden of showing that he has standing for each type of relief sought."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).  "[E]ach element [of standing] must be supported in the same way as any other matter on which

the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Defenders of Wildlife*, 504 U.S. at 561.  Moreover, when a plaintiff seeks a preliminary injunction, the plaintiff's burden to demonstrate standing "will normally be no less than that required on a motion for summary judgment." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 907 n.8 (1990) (citing *Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 328 (D.C. Cir. 1987). Accordingly, to establish standing for a preliminary injunction, a plaintiff cannot "rest on such 'mere allegations,' [as would be appropriate at the pleading stage] but must 'set forth' by affidavit or other evidence 'specific facts,' which . . . will be taken to be true." *Defenders of Wildlife*, 504 U.S. at 561.  "[A plaintiff's] burden of proof is to show a substantial probability that it has been [or will be] injured, that the defendant caused [the] injury, and that the court could redress that injury.  In assessing . . . standing, we must assume [plaintiffs] will prevail on the merits of their claims." *Ams. for Safe Access v. Drug Enforcement Admin.*, 706 F.3d 438, 443 (D.C. Cir. 2013) (citations and internal quotation marks omitted).

Moreover, insofar as the government regulation Plaintiffs seek to challenge here does not require or forbid any action of Plaintiffs, these plaintiffs shoulder a heavier standing burden than most.  *State Nat. Bank of Big Spring v. Lew*, 958 F. Supp. 2d 127, 133 (D.D.C. 2013) ("[W]here the challenged regulations neither require nor forbid any action on the part of the challenging party—*i.e.,* where that party is not the object of the government action or inaction—standing is not precluded, but it is ordinarily substantially more difficult to establish.") (internal quotation marks omitted) (citing *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 457-58 (D.C. Cir.

16

2012)).  This is because it is more difficult to demonstrate certainly impending injury when a party challenges government regulation of a third party.  *See Defenders of Wildlife*, 504 U.S. at 562 (explaining that, when "the existence of one or more of the essential elements of standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict[,]" the plaintiff must "adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury").  This high hurdle is not an absolute bar, however; "courts occasionally find the elements of standing to be satisfied in cases challenging government action on the basis of third-party conduct" such as where a plaintiff challenges "government action that permits or authorizes third-party conduct that would otherwise be illegal in the absence of the Government's action" or "where the record present[s] substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress."  *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 940-41 (D.C. Cir. 2004).

Finally, it is important to note that the plaintiffs in this case have sued in two capacities:  Margaret Sowerwine and Jane Foran have brought this action as individuals, and FWW is suing on behalf of itself and its members.  A plaintiff who brings an action in federal court in her individual capacity must demonstrate that she has standing to sue in her own right—*i.e.*, that she satisfies the requirement of a concrete and particularized injury-in-fact that is redressable by relief from this Court, as described above.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  An organizational plaintiff is

held to a slightly different standard insofar as it may sue both on behalf of itself, *see, e.g., Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982), and also on behalf of its members, but only to the extent that its members themselves have standing, *see, e.g., Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342-43 (1977).[9]

## III.    ANALYSIS

In an effort to establish that the Article III standing requirements have been satisfied in this case, Plaintiffs have made myriad arguments in support of their contention that the FSIS's promulgation of the NPIS rules has harmed or will imminently injure individual plaintiffs Sowerwine and Foran and/or organizational plaintiff FWW.  Briefly and in sum, Plaintiffs assert that individual plaintiffs Sowerwine and Foran have been injured primarily in two different respects: (1) the agency's promulgation of the NPIS has substantially increased the risk that Sowerwine and Foran will purchase and consume adulterated, low-quality, or unwholesome poultry products and these plaintiffs will have to go to great lengths to avoid these risks (*see* Pls.' Mot. at 22-27); and (2) Sowerwine and Foran's interest in receiving information about the products they purchase has been compromised because the USDA inspection legend on poultry products no longer necessarily conveys the information that federal inspectors have inspected the poultry product in accordance with the PPIA (*see id.* at 27-28).  With respect to the contention that FWW faces the requisite injury, Plaintiffs also offer two arguments:  (1) FWW's members will be injured in the same manner as Sowerwine and Foran and the organization has standing to sue on their behalf (*see* Pls.'

---

[9] When an organization sues in its own right, the organization is subject to the same standing requirements as individuals; that is, just like an individual, the organization must show that it has suffered an injury-in-fact.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

Mot. at at 29-31); and (2) FWW can sue in its own right because, if the NPIS goes into effect, the resources that FWW has already spent on advocating against the NPIS will have been wasted and FWW also will have to expend additional resources educating its members and the public about the harmful impact of the NPIS rules (*see id*. at 32-33). In addition, Plaintiffs maintain that both types of plaintiffs have suffered a procedural injury that gives rise to standing to sue because the FSIS failed to provide an opportunity for oral opposition to the proposed rules, nor did the individual or organizational plaintiffs have a chance to comment on the final line speed or opt-in system prior to enactment of the regulation (*see id*. at 28, 33-34; Pls.' Reply at 9).

This Court has reviewed each basis that Plaintiffs' have proffered separately, and discusses each in detail below.  For the reasons that follow, the Court concludes that none of Plaintiffs' standing arguments flies.

### A.      The Individual Plaintiffs Lack Standing To Sue

#### 1.   The Alleged "Risk" Injury Does Not Qualify As An Injury-In-Fact

Plaintiffs' primary argument in support of their contention that Sowerwine and Foran have standing to sue is that the agency's NPIS rules have increased the risk that adulterated poultry products will be released into the stream of commerce, and that, "as regular purchasers of poultry product," Sowerwine and Foran "risk purchasing and consuming adulterated or unwholesome chicken or poultry slaughtered at NPIS establishments[.]"  (Pls.' Mot. at 22).  Moreover, "[t]o avoid these risks," Plaintiffs maintain that Sowerwine and Foran "will have to pay the added costs to purchase poultry that is not from an NPIS facility, to the extent that they can even do so by purchasing it at farmers' markets or other such establishments, or they must avoid

consuming poultry product altogether." (*Id.* at 26.)  In other words, because Sowerwine

and Foran "regularly purchase and consume chicken or turkey[,]" they are "concerned

about the increased risk of harm to their health," and "the significant increase in costs"

that would result from having to seek out alternative poultry sources, and it is these

concerns that, according to Plaintiffs, amount to a cognizable injury-in-fact that gives

them standing to challenge the Defendants' adoption of the NPIS.  (Pls.' Reply at 9.)

      This Court disagrees.  No less an authority than the Supreme Court of the United

States has long held that, in order to qualify as an injury-in-fact for the purpose of

having standing to sue, the harm that purportedly results from the challenged conduct

must be imminent (aka "certainly impending"), which ordinarily means that the plaintiff

must show that the injury *will* occur as a result of the challenged act.  *Clapper v.

Amnesty Int'l USA*, 133 S.Ct. 1138, 1149 (2013); *see also Whitmore v. Ark.*, 495 U.S.

149, 158 (1990) (internal quotation marks and citations omitted) ("Allegations of

possible future injury do not satisfy the requirements of Art. III[; a] threatened injury

must be certainly impending to constitute injury[-]in[-]fact.").  To be sure, an increased

*risk* of harm to the plaintiff—as opposed to certain injury—may constitute a cognizable

injury-in-fact, especially in cases involving challenges to new agency actions that have

unknown or unknowable effects.  *See, e.g.*, *Massachusetts v. Envtl. Prot. Agency*, 549

U.S. 497, 516-21 (2007).  But a plaintiff who plans to satisfy the imminent injury

requirement by alleging that the challenged act will increase the risk of harm to her,

must do more than merely assert that there is some conceivable risk that she will be

harmed on account of the defendant's actions.  Rather, according to the D.C. Circuit,

such plaintiff must demonstrate that due to the challenged conduct there is "both (i) a

*substantially* increased risk of harm and (ii) a *substantial* probability of harm [to the

plaintiff] with that increase[d risk] taken into account." *Pub. Citizen, Inc. v. Nat'l*

*Highway Traffic Safety Admin. ("Pub. Citizen II")*, 513 F.3d 234, 237 (D.C. Cir. 2008)

(emphasis in original).[10]

Of course, requiring that the defendant's action "substantially" increase the risk

of harm, and also that there be a "substantial" probability that plaintiff would be injured

by this increased risk, "poses questions of degree" that are "far from fully resolved."

*Virginia State Corp. Comm'n v. F.E.R.C.*, 468 F.3d 845, 848 (D.C. Cir. 2006).  But the

D.C. Circuit has emphasized that, at the very least, courts need to focus on "the

constitutional requirement of imminence as articulated by the Supreme Court" when

"applying the 'substantial' standard," and has concluded that the imminent-injury

mandate "necessarily compels a very strict understanding of what increases in risk and

overall risk levels can count as 'substantial.'" *Pub. Citizen, Inc. v. Nat'l Highway*

*Traffic Safety Admin. ("Pub. Citizen I")*, 489 F.3d 1279, 1296 (D.C. Cir. 2007).  This

understanding includes viewing a "*substantially* increased risk of harm," *Pub. Citizen,*

*Inc. II*, 513 F.3d at 237, as a significant increase in risk that, while not necessarily

quantifiable, is "sufficient to take the suit out of the category of the hypothetical,"

*Sierra Club v. Envtl. Prot. Agency*, 754 F.3d 995, 1001 (D.C. Cir. 2014) (citing *Natural*

*Res. Def. Council v. Envtl. Prot. Agency*, 464 F.3d 1, 6 (D.C. Cir. 2006)).  Thus, a

plaintiff must ordinarily show that the defendant's action has made it *much* more likely

---

[10] This two-part test is particularly relevant in cases where a plaintiff seeks to challenge a new agency
action that has not yet been implemented.  *Cf. Natural Res. Def. Council v. Envtl. Prot. Agency*, 464
F.3d 1, 6 (D.C. Cir. 2006) (noting that, because "[e]nvironmental and health injuries often are purely
probabilistic," plaintiffs need only "demonstrate a 'substantial probability' that they will be injured" to
satisfy the standing requirement).

that the harm plaintiff fears will occur than would otherwise be the case.  *See Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 669-70 (D.C. Cir. 1996); *but see Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1235 (D.C. Cir. 1996) (suggesting that, if the threatened injury is severe, "relatively modest increments in risk should qualify for standing").  Furthermore, under D.C. Circuit precedent, the plaintiff must also demonstrate that, due to her own proximity to the defendant's activities or otherwise, there is a substantial probability that the plaintiff herself will be injured as a result of the increased risk that follows from defendant's challenged act.  *Cf. Sierra Club v. Envtl. Prot. Agency*, 755 F.3d 968, 973 (D.C. Cir. 2014) ("When, as here, the party seeking judicial review challenges an agency's regulatory failure, . . . the petitioner need demonstrate only a 'substantial probability' that local conditions will be adversely affected, and thus will harm members of the petitioner organization.") (internal quotation marks and citations omitted).

In short, it is well-established that a bald risk-of-injury assertion is patently insufficient to demonstrate that a plaintiff has constitutional standing, and it is not an easy task to satisfy the required two-part showing that, first, the challenged action significantly increases the risk that harm will occur, and second, given this increased risk, there is a substantial probability that the plaintiff will be harmed by defendant's conduct.  As a practical matter, then, "[a]lthough the D.C. Circuit has not closed the door to all increased-risk-of-harm cases, the door remains only slightly ajar." *Ass'n of Am. Physicians & Surgeons, Inc. v. Food & Drug Admin.*, 539 F. Supp. 2d 4, 17 (D.D.C. 2008) aff'd sub nom. *Ass'n of Am. Physicians v. Food & Drug Admin.*, 358 F. App'x 179 (D.C. Cir. 2009) (internal quotation marks and citations omitted).

#### a.  *Plaintiffs Have Failed To Show That The NPIS Substantially Increases The Risk Of Adulterated Poultry*

The risk-of-harm contention that Plaintiffs seek to advance here rests squarely on the proposition that the NPIS will increase the risk that the slaughterhouses that opt in to the new poultry inspection system will produce unwholesome poultry products that will make their way into the consumer market, leading to "increased risks of harm to [human] health" and also a "significant increase in [the] costs" that Plaintiffs will have to incur to avoid such harm.  (Pls.' Mot. at 26.)  The principles articulated above establish that, in order to have standing to challenge the NPIS, Plaintiffs must start by showing that the NPIS rules substantially increase the risk that NPIS slaughterhouses will produce adulterated (harmful) poultry; for the reasons explained in this section, this Court has concluded that Plaintiffs' risk-related standing argument falters even at this first stage of the risk-injury analysis.  That is, even if one assumes that adulterated poultry poses a severe threat to human health, Plaintiffs have failed to show that the Defendants' adoption of the NPIS will result in *any* increase in the risk of adulterated poultry products being introduced into the stream of commerce, much less the "significant" increase that is required to give rise to standing to sue.

In this regard, the Court pauses to note that Plaintiffs do not allege that *every* bird processed at an NPIS plant will be adulterated under the NPIS (and thus that the NPIS rules necessarily and unavoidably increase the chance that consumers such as Sowerwine and Foran ultimately will be exposed to adulterated poultry).  Rather, Plaintiffs merely insist that *more* of the birds processed at NPIS plants and released into the stream of commerce will be adulterated than is currently the case. (*See* Pls.' Mot. at 37-42).  Of course, what the evidence shows regarding how many "more" adulterated

birds will be produced under the NPIS system versus the traditional system, if any—a matter that this Court discusses below—is the crux of the "substantial increase risk" analysis, but it is worth recognizing at this point that Plaintiffs' risk-injury argument differs in kind from many other cases in which a substantial increase in the risk of harm has been held to be sufficient for standing purposes precisely because in this case, unlike others, the question of whether the NPIS rules actually will generate any more adulterated poultry (*i.e.*, whether the challenged conduct in fact poses any increased risk of harm) must first be asked and answered.

That threshold finding generally is not disputed in many cases.  For example, when the defendant is a government agency that has effectively licensed the operation of a private nuclear power plant, the increased risk of harm that is associated with the production of atomic energy is well established and uncontroverted.  *See Duke Power Co. v. Carolina Envtl. Study Grp., Inc.,* 438 U.S. 59, 74 (1978) (explaining that "the emission of non-natural radiation into appellees' environment" raises a "generalized concern about exposure to radiation and the apprehension flowing from the uncertainty about the health and genetic consequences of even small emissions like those concededly emitted by nuclear power plants").  Similarly, when an agency rule permits domestic manufacturers to increase their use of methyl bromide—"a naturally occurring gas" that scientists have long believed "can destroy the layer of ozone gas in the stratosphere" and thereby "increase[] human exposure to ultraviolet radiation" causing "a range of ailments, including skin cancer and cataracts," *Natural Res. Def. Council v. Envtl. Prot. Agency*, 464 F.3d 1, 3-4 (D.C. Cir. 2006)—there is little doubt that the challenged agency action does, as a general matter, increase the risk of harm.  *See id.* at

7 (explaining that there was no dispute that EPA's rule would result in more harmful ozone-depleting methyl bromide being released into the atmosphere; instead, the standing challenge was based on defendant's contention that the organizational plaintiff had not shown that a large enough number of its members actually would suffer physical harm as a result of these emissions).  By contrast, the agency action that Plaintiffs challenge here—the promulgation of the NPIS rules—does not involve a similarly known or established increased risk of injury; consequently, Plaintiffs' first standing hurdle is to demonstrate that the NPIS rules actually do increase the number of adulterated birds that poultry plants produce in comparison to the traditional poultry inspection system.  *Cf., e.g.*, *Mountain States*, 92 F.3d at 1234 (noting that, when plaintiffs claim standing based on an injury to "aesthetic and environmental interests," they "must [first] show that the acts under review posed a threat to these interests" (citations omitted)).

This Court has no problem concluding that Plaintiffs have failed to make a satisfactory increased-risk-of-harm showing here.  That is, although Plaintiffs maintain that there are "reams of evidence showing that the NPIS rules will result in a substantially greater risk of unwholesome and adulterated product reaching the market[,]"  (Pls.' Reply at 13), the three types of evidence that they point to does little to bolster that point.  First, Plaintiffs rely on various comments about the proposed NPIS rules that were submitted to the USDA during the rulemaking process and "affidavits from current and former inspectors who [state] that just as a matter of common sense you're going to have greater entrance of contaminated and adulterated carcass into commerce" under the NPIS system.  (Mot. Hr'g Tr. at 13:2-7.)  In this

regard, Plaintiffs' primarily contend that establishment staff will be less willing or able "to make the proper judgment call as to whether [an adulterated bird] should be condemned" than federal inspectors, who "undergo extensive training" to learn how to make that judgment.  (Pls.' Mot. at 39; *see* Pls.' Reply at 14 ("Common sense dictates that when establishment staff, with little incentive and no mandated training, are given great leeway and no oversight, they will allow more adulterated and unwholesome product to pass."); *see also* Corrigan Ex. H:  Government Accountability Project Comments on NPIS, Ex. 15 to Pls.' Mot., ECF No. 3-15, 48 ("It is my experience that plants are mostly concerned with production and maintenance of the production line at high speeds. . . . I have yet to see a plant properly train their employees in poultry sorting, and I have seen plant leadership fire those who bring food safety or quality assurance issues to their attention.").  However, the "common sense" increased risk of harm that Plaintiffs say will arise if establishment employees are permitted to sort and reprocess poultry carcasses is based on anecdotes and speculation, and it contradicts data that, according to the agency, amounts to established fact.  In the agency's view, data from the HIMP pilot project conclusively demonstrates that "establishment employees do effectively sort carcasses, dispose of carcasses that must be condemned, and conduct necessary trimming and re-processing activities before the carcasses are presented to the [online federal inspector]."  79 Fed. Reg. 49,584.  And in light of such data regarding the *actual* effectiveness of employee sorting, Plaintiffs' "fox guarding the henhouse" assertions of increased-risk (Corrigan Ex. H at 2) appear to be both unsupported and overblown.

Plaintiffs' attempt to show that the HIMP data itself revealed an increased risk of harm to poultry consumers fares no better. (*See* Pls.' Mot. at 42 ("Defendants' own data shows that consumers will be harmed under NPIS."); *see also* Mot. Hr'g Tr. at 16:17-22 ("[T]he defendants have brought forth data that they claim shows that there will not be adulterated or unwholesome carcasses that are removed or that leave the plant under a new poultry inspection system.  And we just vigorously refute that analysis.").) Plaintiffs highlight four data points in particular, claiming that: (1) "Defendants' data from 1998 to 2007 shows that 14 of the 20 HIMP establishments evaluated had lower Salmonella positive rates under non-HIMP inspection than when they were under HIMP[;]" (2) "Defendants' 2011 HIMP Analysis found that Salmonella rates are higher in HIMP chicken plants in the most recent years of that study, 2009 and 2010, compared to non-HIMP comparison establishments[;]" (3) "the part of the 2011 HIMP Analysis that evaluated HIMP and non-HIMP facilities' Noncompliance Record rates showed a statistically higher health-related rate for HIMP plants for certain procedures for three years of data compared to non-HIMP plants[;]" and (4) "Defendants' risk analysis itself predicts an increase in Campylobacter illnesses in chicken establishments under some inspection scenarios."  (*Id*. at 42.)

This narrow focus on certain agency findings is an exceedingly myopic view of the HIMP-related data that homes in on a few areas in which the processing plants with the modified rules scored lower than establishments with the traditional inspection systems, while missing the larger and far more significant conclusion to be drawn from the agency's interpretation of the data:  that the agency anticipates an *overall reduction* in foodborne illnesses under the new poultry inspection system.  *See* 79 Fed. Reg. 49,

624 ("FSIS . . . estimates that industry-wide adoption of NPIS would reduce the number of human illness attributed to young chicken and turkey products by an average of about 3,980 (with a range of 1,510 to 6,960) Salmonella illnesses and about 840 (with a range of 100 to 1,860) Campylobacter illnesses."); FSIS, USDA, Evaluation of HACCP Inspection Models Project (Aug. 2011), at 7 ("[A]n inspection system based on the HIMP system . . . [would] ensure an equivalent, if not better, level of food safety and other consumer protection than that provided by the existing poultry slaughter inspection systems.").  According to the agency's report, the HIMP data shows that, overall, the NPIS will reduce—not increase—the likelihood that adulterated poultry will enter the market, and the discrete data points that Plaintiffs rely on to suggest the HIMP pilot was less effective than the traditional inspection system in certain areas when measured by certain metrics plainly miss the mark of establishing increased risk of harm.

Undeterred by the agency's HIMP findings, Plaintiffs also endeavor to attack the reliability of the HIMP study itself, arguing that the analysis "suffers from selection bias because . . . only those establishments that volunteered for the HIMP pilot were evaluated," and "these volunteering establishments were subject to more intense scrutiny" in the HIMP context than they would be under the NPIS.  This argument suggests that the results of the pilot project cannot be generalized and that the NPIS rules will not necessarily generate HIMP outcomes, but it does not advance the ball at all toward demonstrating that the NPIS rules in fact increase the risk that adulterated poultry will be released from NPIS processors.  Put another way, while Plaintiffs are tasked at this point with showing that the challenged agency action (promulgation of the

NPIS rules) increases the likelihood that harmful poultry will be generated, but instead of offering statistical or scientific proof that the NPIS rule will lead to the result that Plaintiffs fear, they argue that the volunteer plants performed better in the HIMP context then they will under the NPIS rules.  Plaintiffs' attempt to cast aspersions on the replicability of the agency's HIMP model are largely irrelevant, because at most, this argument suggests that a processing system operating under the NPIS rules may not actually be as effective in protecting food safety as Defendants' HIMP analysis shows, and one cannot reasonably infer from an allegation that the HIMP model may not be as stellar as the agency's data suggests that an inspection system modeled on the HIMP produces more adulterated poultry than the traditional poultry inspection systems, as Plaintiffs would have this Court do.

In short, far from providing data and information that demonstrates that there is, in fact, an increased risk that adulterated and unwholesome poultry will be released into the stream of commerce as a result of the NPIS rules, Plaintiffs here plainly ask this Court to accept sheer speculation about the bad things that might happen to the nation's poultry supply if sorting is placed in the hands of establishment employees (*see* Pl.'s Mot. at 23, 25), and to employ "simple logic to conclude that the challenged actions result in a nontrivial increase in the risk" of harm (Pls. Reply at 13).  This Court is unwilling to do so, especially where, as here, the data and information that plaintiffs highlight tends to show the opposite—*i.e.,* that processing poultry pursuant to the NPIS rules will be *beneficial* rather than potentially harmful.  Plaintiffs must do more than offer anecdotes and "common sense" (Pls.' Reply at 14) to carry their burden of establishing a substantial increased risk of harm, and because Plaintiffs here have failed

to point to any scientific evidence demonstrating that the NPIS rules are even incrementally more likely to produce adulterated poultry products, this Court concludes that Sowerwine and Foran do not have Article III standing on the basis that the NPIS substantially increases the risk of harm.[11]

> b. *Plaintiffs Have Not Demonstrated That There Is A Substantial Probabilit*y That, *As a Result Of The NPIS, Sowerwine and Foran Will Suffer Harm*

Notably, even if this Court accepted Plaintiffs' argument that the NPIS system substantially increases the risk that adulterated poultry products will enter the stream of commerce, Plaintiffs would still fall short of demonstrating that Sowerwine and Foran have Article III standing because they have failed to show that there is a clear and close nexus between the agency's action, the feared result, and these individual plaintiffs.  As explained above, no matter how harmful the challenged conduct may be, a plaintiff must show that she herself faces a substantial probability of being injured, and it is well established that, to be sufficiently probabilistic, plaintiff's alleged injury cannot depend on "a highly attenuated chain of possibilities" or "require guesswork as to how independent decisionmakers will exercise their judgment[.]"  *Clapper*, 133 S.Ct. at 1148, 1150; *see also Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972) ("[T]he

---

[11] *Baur v. Veneman*, 352 F.3d 625 (2d Cir. 2003), which Plaintiffs cite repeatedly to support their contention that they have standing to challenge the NPIS based on the alleged increased risk of harm posed by that poultry inspection system (*see, e.g.*, Pls.' Mot. at 27; Pls.' Reply at 13 n.4, 15.), is not to the contrary.  In *Baur*, the Second Circuit held that the plaintiff (a consumer of beef) had standing to challenge USDA regulations that permitted the marketing of beef from "downed" cattle, based on the alleged increased risk that such cattle might be infected with Bovine Spongiform Encephalopathy ("BSE," commonly known as "mad cow" disease).  *Baur*, 352 F.3d at 635.  But what distinguishes that case from this one is that the plaintiff did not rely solely on intuition and speculation about the potential negative effects of the rule change; rather, "the USDA itself as well as other government agencies [had] recognized that downed cattle are especially susceptible to BSE infection," and according to the court, "government studies and statements confirm[ed] several of Baur's key allegations" about the potential increased risk of harm.  *Id*. at 637-38.  No such confirmation exists here.

'injury[-]in[-]fact' test requires more than an injury to a cognizable interest.  It requires that the party seeking review be himself among the injured.").  Thus, the Supreme Court in *Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983), held that a plaintiff motorist who had been stopped and allegedly placed in a chokehold by police officers lacked standing to sue to enjoin the entire Los Angeles police department from using a choke hold on him should he ever be stopped again at some unknown time in the future, because "it is no more than conjecture" that "the police will act unconstitutionally and inflict injury without provocation or legal excuse" and "it is surely no more than speculation" that "Lyons himself will again be involved in one of those unfortunate instances."  By contrast, in *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 152-54 (2010), the Court held that conventional alfalfa farmers did have standing to challenge a government agency's decision to deregulate genetically engineered alfalfa because the genetically engineered alfalfa was being planted within the pollination range of bees that could transfer the genetically engineered alfalfa genes to the farmers' conventional alfalfa fields.  *See Clapper*, 133 S. Ct. at 1153-54 (internal alterations and quotation marks omitted) (citing *Monsanto*, 561 U.S. at 153 n.3) ("The standing analysis in [*Monsanto*] hinged on evidence that genetically engineered alfalfa seed fields were currently being planted in all the major alfalfa seed production areas; the bees that pollinate alfalfa have a range of at least two to ten miles; and the alfalfa seed farms were concentrated in an area well within the bees' pollination range.").  Taken together, *Lyons* and *Monsanto* teach that there must be a close connection between the defendant's allegedly wrongful conduct and the plaintiff, and also that proximity is

important to a court's assessment when the alleged basis for a plaintiff's standing is injury from an increased risk of harm.

Here, even if the NPIS rules substantially increase the risk of *someone* being exposed to adulterated poultry, Sowerwine and Foran have not demonstrated any proximity between themselves and a poultry slaughterhouse that will operate under the challenged NPIS rules, and an injury *to them* does not follow inexorably from the agency's adoption of the NPIS.  Although it is true that the FSIS's "Preliminary Regulatory Impact Analysis anticipates that 99.9 percent of the young chickens and turkeys produced by the domestic poultry industry would come from plants operating under NPIS rules" (Pls.' Reply at 11 (citing 77 Fed. Reg. 4408); *see also* Pls.' Mot. at 38), the agency has provided each poultry processing establishment with a choice of whether or not to adopt the new inspection system, and thus Defendants are correct that "it is speculative at this point as to how many plants will convert to NPIS, and the ultimate schedule for such conversion." (Defs.' Opp. at 25 (citing 79 Fed. Reg. 49,619).)

What is more, before Sowerwine and Foran could possibly be sickened from consumption of poultry that is adulterated on account of the NPIS rules, a series of unfortunate events would need to occur, each of which is far from inevitable.  That is, Sowerwine and Foran would not only have to select a grocer that is supplied from a slaughterhouse establishment that has opted-in to the NPIS system, but their particular retailer would have to choose to stock an adulterated bird, and Sowerwine and Foran themselves would have to choose to buy and eat the unwholesome poultry.  And this string of attenuated circumstances would have to be preceded by a number of other poor

choices:  the slaughterhouse establishment's employees would have to fail to identify and remove that adulterated bird from the slaughter line, and the federal inspector at the end of the line would have to refuse to condemn the adulterated poultry.  Given the number of discretionary steps that would be required for an unwholesome poultry product to get from the slaughterline to Sowerwine and Foran's kitchen tables, Sowerwine and Foran's fear of injury is clearly too "highly speculative[,]" *Clapper*, 133 S. Ct. at 1148, to support their claim of standing.

### c.  The Individual Plaintiffs' Alleged Risk-Avoidance Harm Does Not Give Rise To Standing

This Court is also entirely unmoved by Plaintiffs' assertion that they will incur costs, or suffer injury, when they act to avoid the risk of being exposed to adulterated poultry and that they have standing to sue because of this avoidance injury.  Sowerwine and Foran maintain that, due to their concerns over getting ill from poultry that an NPIS slaughterhouse facility has processed, they will forgo their normal shopping routines and engage in other costly "avoidance" behaviors.  (*See* Pl.'s Mot. at 26 (citing Sowerwine Decl. ¶ 10; Foran Decl. ¶¶ 12-13).).  "Certainly he who is 'likely to be financially injured' [by an agency's actions] may be a reliable private attorney general to litigate the issues of the public interest in the present case." *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 154 (1970) (quoting *FCC v. Sanders Bros. Radio Station*, 309 U.S. 470, 477 (1940)); *see, e.g.*, *Nat'l Air Traffic Controllers Ass'n, MEBA, AFL-CIO v. Pena*, 944 F. Supp. 1337 (N.D. Ohio 1996) (holding that Air traffic controllers' loss of their jobs as result of Federal Aviation Administration's decision to contract out to the private sector air traffic control responsibilities at all of its Level 1 facilities was an injury-in-fact).  But it is clear beyond cavil that a plaintiff

"cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 133 S. Ct. at 1151; *see also Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006) ("We have consistently held that self-inflicted harm doesn't satisfy the basic requirements for standing.").  In other words, a plaintiff cannot transform a remote risk into a concrete injury merely by taking steps to avoid that risk; to hold otherwise would eliminate the injury-in-fact requirement entirely because plaintiff's actions are always within plaintiff's control. *Cf. Ellis v. Comm'r of Internal Revenue Serv.*, No. 14-0471 (ABJ), 2014 WL 4557643, at *9 (D.D.C. Sept. 16, 2014) ("[I]t is well-settled in this jurisdiction that self-inflicted injuries—injuries that are substantially caused by the plaintiff's own conduct—sever the causal nexus needed to establish standing.").

The Supreme Court recently and resoundingly rejected a risk-avoidance standing argument that is similar to the one Plaintiffs make here and that was made in analogous factual circumstances. *See Clapper*, 133 S.Ct. 1138 (2013).  The Plaintiffs in *Clapper* were attorneys and human-rights, labor, legal, and media organizations who worked with foreign clients or sources. *See id.* at 1145-46.  Plaintiffs claimed that they were likely to be targeted for surveillance under section 1881a of the Foreign Intelligence Surveillance Act because of their clients and sources, and sought to challenge the Act's authorization of surveillance of this type. *See id.*  Plaintiffs claimed that the Act injured them because, in order to avoid the authorized telephone and email surveillance, the plaintiffs undertook "'costly and burdensome measures' to protect the confidentiality of sensitive communications" like travelling abroad to have in-person

conversations rather than speaking on the telephone or writing emails.  *See id*. at 1146.

The *Clapper* Court stated that "Respondents' contention that they have standing

because they incurred certain costs as a reasonable reaction to a risk of harm is

unavailing—because the harm respondents seek to avoid is not certainly impending.  In

other words, respondents cannot manufacture standing merely by inflicting harm on

themselves based on their fears of hypothetical future harm[.]"  *Id*. at 1151.

    So it is here.  As concerned as Sowerwine and Foran may be that they will

become ill as a result of the NPIS rules and as earnestly as they may seek to undertake

steps to avoid this potential injury, their risk avoidance measures are an insufficient

basis for standing after *Clapper*.  Thus, just as Sowerwine and Foran do not have

standing to sue on the basis of the alleged (but unproven) increased risks that the NPIS

poses to human health, they also lack standing on the basis of the steps they plan to take

to avoid this purported increased risk of injury.

    2.  <u>The Individual Plaintiffs Were Not Deprived Of Information That The
PPIA Requires Disclosed</u>

Plaintiffs have clearly placed the majority of the individual plaintiffs' standing

eggs in the risk-injury basket; however, Plaintiffs also argue that Sowerwine and Foran

have standing to challenge the NPIS regulations on the basis of the PPIA requirement

that poultry products that have been inspected and approved must be marked with the

USDA inspection legend.  (*See* Pls.' Mot at 27.)  *See also* 21 U.S.C. §§ 457 (requiring

federal inspectors to affix an official inspection legend on processed poultry); 9 C.F.R.

§ 381.96 (establishing that this official inspection legend must state "Inspected for

wholesomeness by U.S. Department of Agriculture").  Specifically, Plaintiffs refer to

the PPIA's labeling scheme and engage in the following three-part "informational

standing" analysis:  (1) because the individual Plaintiffs are entitled to, and rely upon,

the information that the agency's inspection legend conveys—*i.e.*, that federal

inspectors have inspected the poultry product in accordance with the PPIA—and (2)

because "the poultry product that they encounter in the grocery stores will not actually

be inspected by federal inspectors pursuant to the PPIA, but, rather, will be product

from a secret set of NPIS establishments" wherein, "among other deficiencies,

Defendants are not responsible for condemning product and supervising establishment

staffs' reprocessing tasks, as is required by the statute," then (3) Sowerwine and Foran

"are robbed of th[e] information [the inspection legend conveys] under the NPIS rules"

in a manner that gives rise to a cognizable injury.  (Pls.' Mot. at 27-28.)[12]

To be sure, a court can conclude that a plaintiff suffers an injury-in-fact if the

defendant has a statutory obligation to provide plaintiff with information and fails to do

so, *see Ethyl Corp. v. Envtl. Prot. Agency*, 306 F.3d 1144, 1148 (D.C. Cir. 2002), but

the "informational standing" doctrine is exceedingly limited—it "arises 'only in very

specific statutory contexts' where a statutory provision has 'explicitly created a right to

information.'" *American Farm Bureau v. Envtl. Prot. Agency*, 121 F.Supp.2d 84, 97

(D.D.C. 2000) (quoting *Animal Legal Defense Fund, Inc. v. Espy*, 23 F.3d 496, 502

(D.C. Cir. 1994)).  Consequently, a plaintiff asserting informational standing must "(1)

---

[12] Notably and in this regard, Plaintiffs have expressly eschewed Defendant's interpretation of the "information" that is allegedly being wrongfully withheld.  Defendants understand Plaintiffs to be arguing that, under the PPIA, "poultry [must] be labeled with information about the *type* of inspection system used at the plant from which it comes"—*i.e.,* the traditional inspection system or the NPIS—and that Sowerwine and Foran are being denied that specific information.  (Defs.' Opp. at 27 (emphasis added).)  But Plaintiffs specifically state that they "do *not* assert that they are statutorily entitled to poultry 'labeled with information about the type of inspection system used at the plant from which it comes,' as Defendants contend."  (*See* Pls.' Reply at 16-17 (emphasis added).)  "Rather, Plaintiffs claim that they have standing because the PPIA entitles them to the information conveyed by the Defendants' inspection legend, *i.e.*, that poultry product has been actually inspected by federal inspectors in accordance with the PPIA."  (*Id.*)

identify a statute that, on plaintiff's reading, directly requires the defendant to disclose information that the plaintiff has a right to obtain, (2) show that [plaintiff] has been denied the information to which [plaintiff] is entitled, and (3) provide a credible claim that the information would be helpful to [plaintiff]."  *WildEarth Guardians v. Salazar*, 859 F. Supp. 2d 83, 92 (D.D.C. 2012) (citing *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998)).  Although Plaintiffs here employ the terminology of this legal standard, they do not, and cannot, satisfy the narrow "informational" injury requirements under the circumstances of this case because, as explained below, the PPIA is not a statute that directly requires the disclosure of information that Sowerwine and Foran have a right to obtain, nor have Plaintiffs shown that Sowerwine and Foran have been denied the information to which they are entitled.

First, and foremost, Plaintiffs have not demonstrated that the PPIA requires the USDA to disclose information that Sowerwine and Foran have a right to obtain.  The PPIA is not a public disclosure statute, and in that respect alone it differs significantly from other statutes that may give rise to informational standing.  *Compare Original Honey Baked Ham Co. of Georgia v. Glickman*, 172 F.3d 885, 887 (D.C. Cir. 1999) (noting that the PPIA and the Meat Inspection Act "share the common purpose of ensuring that meat and poultry products are wholesome, and not adulterated, all to the end of protecting the health and welfare of consumers and the market) *with Bensman v. Forest Serv.*, 408 F.3d 945, 958 (7th Cir. 2005) (explaining that public disclosure statutes, such as the Freedom of Information Act and the Federal Advisory Committee Act, share "the goal of providing information to the public").

Moreover, there is no basis in law or logic for Plaintiffs' argument that the PPIA should be treated as a disclosure statute for the purpose of informational standing based solely on the fact that it contains a labeling mandate.  Plaintiffs do not cite any precedent for the proposition that a labeling requirement alone is sufficient to convert a law into an information sharing statute, and indeed, a prior case in this district has rejected that same argument in a similar context.  *See Am. Farm Bureau v. Envtl. Prot. Agency*, 121 F. Supp. 2d 84, 97-99 (D.D.C. 2000) (denying plaintiff's assertion of informational standing based on a Federal Food, Drug, and Cosmetic Act because that statute "does not confer a broad, legally enforceable right to information"). Furthermore, it does not make sense to construe this particular statute to require the disclosure of certain information on the basis of its labeling provision because the PPIA broadly defines the required "official inspection legend" as "*any* symbol prescribed by regulations of the Secretary showing that an article was inspected for wholesomeness in accordance with this chapter"  *See* 21 U.S.C. § 453(m) (emphasis added), and does not obligate Defendants to include any particular information about the inspection process specifically or food safety in general.  Simply stated, then, in the absence of a clear reason for believing that Congress intended the PPIA's labeling requirement to establish a judicially-enforceable right to information about poultry inspection that is akin to the rights that Congress has created in other information-sharing statutes, this Court is unwilling to accept Plaintiffs' broad understanding of a statutory right to information, which would "expand the boundaries of informational standing to encompass every case alleging a governmental failure to implement or enforce any

statutory provision simply because government action creates information." *Am. Farm Bureau,* 121 F. Supp. 2d at 97-98.

Second, even if the PPIA's labeling provision can be construed as a provision requiring the disclosure of information about poultry inspection, Sowerwine and Foran do not have informational standing because they cannot show that they have been denied information to which they are entitled.  A plaintiff asserting informational standing must show "either that they are directly being deprived of . . . information or that the legal ruling they seek might lead to additional factual information." *Wertheimer v. Fed. Election Comm'n,* 268 F.3d 1070, 1074-75 (D.C. Cir. 2001). Plaintiffs here have demonstrated neither.  Rather, their argument appears to be that, because the new poultry processing system is, in their view, *inconsistent* with the PPIA, they are being denied the information that the PPIA requires—to wit, the assurance that "federal inspectors have inspected the poultry product in accordance with the PPIA." (Pls.' Mot at 27.)  The defect in Plaintiffs' informational standing argument is obvious: far from a request for the disclosure of facts that have been withheld to Sowerwine and Foran's detriment, Plaintiffs make the thinly-veiled and circular *legal* assertion that the USDA's NPIS rules violate the PPIA, and that the agency's failure to provide an accurate disclosure regarding its violation of the law has harmed the individual plaintiffs.  But the D.C. Circuit has long explained that for a court "[t]o hold that a plaintiff can establish injury[-]in[-]fact merely by alleging that he has been deprived of the knowledge as to whether a violation of the law has occurred would be tantamount to recognizing a justiciable interest in the enforcement of the law[,]" which courts "cannot do" consistent with the Constitution.  *Common Cause*, 108 F.3d at 418; *see also id.*

("While 'Congress can create a legal right the interference with which will create an Article III injury, Congress cannot, consistent with Article III, create standing by conferring 'upon *all* persons an abstract, self-contained, non-instrumental 'right' to have the Executive observe the procedures required by law.'" (quoting *Defenders of Wildlife*, 504 U.S. at 573) (emphasis in original, alterations omitted)).  Consequently, it is clear that Plaintiffs have failed to establish that Sowerwine and Foran have informational standing.

### B.      The Organizational Plaintiff Lacks Standing To Sue

In addition to asserting that Sowerwine and Foran have standing to bring this action as individual plaintiffs, Plaintiffs also argue that (1) FWW has standing to challenge the NPIS rules on behalf of its members, and (2) FWW has standing to sue in its own right.  This Court disagrees.

### 1.  FWW Does Not Have Standing To Sue On Behalf Of Its Members

An association has standing to sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343.  The FWW members that the organization puts forward in support of its argument for associational standing are Alina Pittman and Wendy Davis.  (*See* Pls.' Mot. at 30.)  Pittman's and Davis's alleged injuries are identical to those of individual plaintiffs Sowerwine and Foran, and Plaintiffs have failed to establish that the individual plaintiffs have standing for the reasons explained above. *See supra*, Part III.A.  Therefore, FWW cannot assert claims on their behalf.

*See, e.g., Albuquerque Indian Rights v. Lujan*, 930 F.2d 49, 53-57 (D.C. Cir. 1991)

(organization lacked standing to bring suit where the organization's individual members

would not have standing to sue in their own right); *Am. Sports Council v. Dep't of

Educ.*, 850 F. Supp. 2d 288, 297-99 (D.D.C. 2012) (dismissing the complaint on

jurisdictional grounds because "Plaintiff has not alleged facts sufficient to show that

any one of the individuals or entities it claims to represent has standing to sue in its

own right"); *Pharm. Research & Mfrs. of Am. v. Thompson*, 259 F. Supp. 2d 39, 51-53

(D.D.C. 2003) (similar).

### 2.   FWW Does Not Have Standing To Sue In Its Own Right

Undaunted, Plaintiffs maintain that FWW has standing to challenge the NPIS in

federal court independent of its members.  (*See* Pls.' Mot. at 32.)  An organization has

suffered an injury-in-fact that entitles it to bring suit in its own right where the

organization can demonstrate: (1) a direct conflict between the challenged conduct and

the organization's mission, and (2) a consequent drain on the organization's resources

resulting from this direct conflict.  *See Am. Soc. for Prevention of Cruelty to Animals v.

Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011).  Plaintiffs argue that the instant

circumstances meet this standard because FWW has consistently opposed the NPIS, and

if the NPIS goes into effect, the resources that FWW has already spent on advocating

against the NPIS will have been wasted and FWW will have to expend additional

resources on activities such as educating its members and the public about how the

NPIS rules are inconsistent with the PPIA, determining which poultry processing

establishments opt-in to NPIS, and encouraging its members and the public to avoid

poultry from those companies.  (*See* Pls.' Mot. at 32-33.)  For the following reasons,

41

these characterizations of FWW's alleged injury are manifestly insufficient to support standing.

> a. *There Is No Conflict Between Defendants' Conduct And FWW's Mission*

It is well established that an allegation that an agency's conduct makes an organization's *activities* more difficult does not establish an injury-in-fact; the organization must instead describe how the defendant agency's conduct strikes at the heart of the organization's core *mission*. *See Abigail Alliance for Better Access to Dev. Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006); *accord Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1429-30 (D.C. Cir. 1996) (explaining that "the presence of a direct conflict between the defendant's conduct and the organization's mission is necessary—though not alone sufficient—to establish standing"). The D.C. Circuit demands this deep tension between the defendant's and plaintiff's respective goals because, "[i]f the challenged conduct affects an organization's activities, but is neutral with respect to its substantive mission, we have found it 'entirely speculative' whether the challenged practice will actually impair the organization's activities." *Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011) (quoting *Nat'l Treasury Emps. Union*, 101 F.3d at 1430). Thus, in each of the cases recognizing injury-in-fact to an organization giving rise to the organization's standing to sue in its own right, courts in this circuit have required that the "purportedly illegal action taken by the defendants was at loggerheads with and squarely countered the plaintiffs' organizational objective." *Nat'l Treasury Emps. Union*, 101 F.3d at 1429-30 (internal quotation marks omitted); *see, e.g.*, *Havens*, 455 U.S. at 378-79 (housing organization whose counseling and referral services were thwarted by the

owner of an apartment complex's racial steering practices asserted a cognizable

organizational injury); *Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794 (D.C. Cir. 1987)

(organization whose purpose was to promote well-being of refugees through programs

and activities, including legal representation, education, acculturation, and social and

referral services, had asserted a cognizable organizational injury where the organization

challenged a program to interdict undocumented aliens on high seas).

Plaintiffs have struggled valiantly to describe myriad ways in which the

Defendants' decision to promulgate the NPIS rules impacts FWW's operations, none of

which demonstrates any conflict between the agency's objectives and the organization's

fundamental mission.  (*See, e.g.*, Pls.' Mot. at 32 (complaining that, as a result of the

NPIS, "FWW would . . . be forced to increase the resources that it spends on educating

the general public and its members that the NPIS rules do not allow for the inspection

of poultry product prescribed by the PPIA"); Pls.' Reply at 18 ("FWW will have to

increase the resources that it spends in ways that it never has before, trying to educate

members on alternative strategies for consuming unadulterated, wholesome poultry,

such as purchasing poultry from farmers markets.").)  Indeed, far from discerning a

conflict, this Court perceives that the stated goals of FWW and the agency are entirely

in sync.  With respect to the goals of FWW, the organization's Assistant Director,

Patricia Lovera, states that FWW is a consumer advocacy organization that "works to

promote the practices and policies that will result in sustainable and secure food

systems that provide healthy food for consumers."  (*See* Lovera Decl. at 2.)  In this

same vein, the final NPIS rule states that "FSIS is issuing this rule to facilitate pathogen

reduction in poultry products, improve the effectiveness of poultry slaughter inspection,

make better use of the Agency's resources, and remove unnecessary regulatory obstacles to innovation."  79 Fed. Reg. 49,566.

Thus, both FWW and the FSIS are striving to improve food safety, albeit in different ways, and the fact that FWW apparently disagrees with the manner in which the USDA is going about achieving the food safety goal in the context of poultry processing is a dispute about *methodology*, not a conflict between the organization's mission and the agency's action that qualifies as an injury-in-fact.  *See, e.g., Common Cause v. Biden*, 909 F. Supp. 2d 9, 22 n.8 (D.D.C. 2012) ("Common Cause has shown no direct conflict between the allegedly illegal conduct—use of the Cloture Rule—and the organization's mission—encouraging transparency in elections."); *Conservative Baptist Ass'n of Am., Inc. v. Shinseki*, No. 13-1762 (JDB), 2014 WL 2001045, at *4 (D.D.C. May 16, 2014) (holding that non-profit corporation accredited to endorse chaplains for a clinical pastoral education program leading to chaplain positions with the Department of Veterans Affairs did not have standing to bring suit seeking reinstatement of two of its chaplain trainees, because "[the organization] has not alleged that [the Department] has prevented it from endorsing chaplains").  In other words, the overall consistency of purpose between the organization and the agency defeats FWW's contention that, by enacting the NPIS, the agency has jeopardized the organization's mission.  *Cf. Sierra Club v. Morton*, 405 U.S. 727, 740 (1972) (explaining that "organizations or individuals who seek to do no more than vindicate their own value preferences through the judicial process" do not allege a constitutionally cognizable injury-in-fact).

*b.  There Is No Injury To FWW's Programmatic Concerns*

Even if one were to assume that there is a direct conflict between the agency's promulgation of the NPIS and FWW's mission, Plaintiffs have also failed to establish that FWW has suffered a direct injury to its programmatic concerns as a result of that conflict.  An organization alleges an injury-in-fact if it can show that it suffered "concrete and demonstrable injury to the organization's activities—with a consequent drain on the organization's resources—constituting more than simply a setback to the organization's abstract social interests."  *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995) (internal quotations and citations omitted).  Such a showing requires "more than allegations of damage to an interest in 'seeing' the law obeyed or a social goal furthered."  *Am. Legal Found. v. FCC*, 808 F.2d 84, 92 (D.C. Cir. 1987).  That is, in order to establish that there has been a concrete injury to its activities, "[t]he organization must allege that discrete programmatic concerns are being directly and adversely affected by the defendant's actions."  *Id.*

As noted above, Plaintiffs here make several claims related to the alleged drain on the organization's resources as a result of the NPIS, including the observation that, if the final NPIS rules go into effect, then "all of [FWW's] time and resources spent towards advocating against NPIS will have been wasted" and that FWW will have to dedicate additional resources toward "educating the general public and its members[.]" (Pls.' Mot. at 32.)  This alleged injury argument is puzzling to this Court in the sense that the organization's purported need for increased expenditures for advocacy and outreach proves precisely the *opposite* of the point that FWW is attempting to make— *i.e.*, it demonstrates that the NPIS likely has *helped* FWW instead of injuring it.  Put another way, far from "wasting" its resources on an unsuccessful bid to fight the

45

agency's new poultry inspection system, FWW presumably fulfills its very purpose when it undertakes to marshal its resources to fight the good fight against agency action that it feels is improper and unwise.  Consequently, rather than being a wasteful distraction that has drained FWW of resources inappropriately, the NPIS plainly has provided FWW with a cause célèbre—one that may even have been at the heart of targeted fundraising efforts—and it is peculiar at best for an organization to contend that it has been injured because it had to raise funds and devote resources to attack a proposed regulation when one of the organization's foundational principles (its raison d'être, if you will) is that it will devote time and resources toward engaging in such an attack.  *Cf., e.g.*, *Elec. Privacy Info. Ctr. v. Dep't of Educ.*, No. 12-0327 (ABJ), 2014 WL 449031, at *16 (D.D.C. Feb. 5, 2014) ("Here, the Final Rule has not impeded EPIC's programmatic concerns and activities, but fueled them.  And the expenditures that EPIC has made in response to the Final Rule have not kept it from pursuing its true purpose as an organization but have contributed to its pursuit of its purpose."); *Nat'l Consumers League v. Gen. Mills, Inc.*, 680 F. Supp. 2d 132, 136 (D.D.C. 2010) ("Challenging conduct like General Mills' alleged mislabeling is the very purpose of consumer advocacy organizations.  As such, General Mills' alleged conduct does not hamper NCL's advocacy effort; if anything it gives NCL an opportunity to carry out its mission.").

Moreover, with respect to Plaintiffs' argument that the NPIS rules will force FWW to increase the resources it spends on educating its members and the public about the NPIS's alleged inconsistency with the PPIA and encouraging its members and the public to avoid poultry from NPIS establishments (*see* Pls.' Mot. at 32), it is clear

beyond cavil that "organizational plaintiffs cannot establish injury that is fairly traceable to defendants' conduct merely by deciding to devote resources to identify and counteract misinformation[.]" *Equal Rights Center v. Post Props., Inc.*, 657 F.Supp.2d 197, 201 (D.D.C. 2009).  Such expenditures are plainly the result of FWW's own budgetary choices, and if an association is "able to gain standing merely by choosing to fight a policy that is contrary to its mission, the courthouse door would be open to all associations" all of the time.  *Long Term Care Pharmacy Alliance v. United Health Grp., Inc.*, 498 F. Supp. 2d 187, 192 (D.D.C. 2007); *see also Abigail Alliance*, 469 F.3d at 133 (citing *Fair Emp't Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276-77 (D.C. Cir. 1994)) ("[A]n organization is not injured by expending resources to challenge a regulation itself; we do not recognize such self-inflicted harm.").  Accordingly, FWW has not suffered a cognizable injury-in-fact merely because it has chosen to spend money in order to educate the public about a rule that the organization does not like.  *C.f., e.g., Fair Emp't Council*, 28 F.3d at 1276-77 (holding that a fair employment organization's diversion of resources to "testing"—that is, sending both black and white people with comparable credentials to an employment agency in order to ascertain whether the agency was discriminating against blacks in the referral process—was a self-inflicted harm).

### c.  *FWW Does Not Properly Assert An Informational Injury*

Finally, Plaintiffs here also appear to maintain that "FWW will be harmed because [the organization] no longer can use" the USDA inspection legend "to inform its consumer members" of the safety of poultry products.  (*See* Pls.' Reply at 18.)  On a generous reading of this argument, Plaintiffs' contention appears to that, with respect to poultry that is inspected pursuant to the NPIS rules, the legend cannot be relied upon as

47

"an indication that poultry product is wholesome and not adulterated because it was inspected in accordance with the PPIA," and as a result, the organization's ability to disseminate information to its members is somehow damaged.  (*See* Pls.' Reply at 18.) Setting aside the fact that there is no discernible connection between the alleged unreliability of the inspection legend and the organization's ability to provide information to its members, Plaintiffs seem to be making essentially the same "informational standing" argument on behalf of FWW as Plaintiffs did on behalf of Sowerwine and Foran:  that the USDA inspection legend should convey the information that federal inspectors have inspected the poultry product in accordance with the PPIA, but the legend does not, in fact, do so because the NPIS is inconsistent with the PPIA. *See supra*, Part III.A.2.

"Allegations of injury to an organization's ability to disseminate information may be deemed sufficiently particular for standing purposes where that information is essential to the injured organization's activities, and where the lack of the information will render those activities infeasible." *Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 122 (D.C. Cir. 1990).  As a general matter, cases applying this standing principle tend to discuss an organization's inability to provide information to their members or the public at large *because the government will not disclose that information to the organization*.  For example, the court in *Friends of Animals v. Salazar*, 626 F. Supp. 2d 102 (D.D.C. 2009), considered whether an environmentalist organization had standing to challenge a Fish and Wildlife Service (FWS) rule that permitted the taking, exporting, reimporting, or selling of certain endangered antelope species.  Prior to the promulgation of the rule, which was an

exemption from an otherwise applicable statutory prohibition, hunters had to apply for special permits to hunt the selected species of antelope, and the organization alleged that it regularly used information from this case-by-case permitting process (which the agency had to make publicly available under the Endangered Species Act) to inform their members of the status of captive antelopes.  *See id.* at 113-14.  Thus, the rule the organization sought to challenge impeded the organization's ability to learn about, and inform their members of, the status of captive antelopes.  *Id; see also Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931, 936-39 (D.C. Cir. 1986) (holding that an organization asserted an injury-in-fact where the organization stated that regulations limiting the flow of information about age discrimination diminished the organization's ability to counsel members on unlawful age discrimination in the denial of benefits).

Here, Plaintiffs do not argue that the NPIS will result in the withholding of information about poultry inspection in a manner that has impacted FWW's ability to mount an effective public education campaign; quite to the contrary, Plaintiffs argue that FWW is well aware of FSIS's actions and that FWW's injury is that the organization will have to spend more money to inform the public about the NPIS.  This Court finds that this alleged injury is not the type of informational harm that qualifies as a cognizable injury-in-fact.  *See Competitive Enter. Inst.*, 901 F.2d at 123 (holding that, where the plaintiff consumer organization had "failed to show how the lack of [information from the government] ha[d] significantly harmed their ability to educate and inform the public," the organization did not have a cognizable injury that would confer standing).  *Id*.  And because Plaintiffs have not shown that the allegedly incorrect USDA inspection label has harmed FWW's ability to educate and inform the

public about food safety, Plaintiffs have failed to establish that FWW has suffered an informational injury that gives rise to organizational standing.

### C.   The Plaintiffs Have Not Established Standing On The Basis Of A Procedural Injury

Plaintiffs' final standing argument relates to an injury that both the individual plaintiffs and the organizational plaintiff have allegedly suffered:  both have allegedly been harmed by a "procedural" failure stemming from the notice and comment process that preceded the promulgation of the final NPIS rules.  (*See* Pls.' Mot. at 19, 33-34.)  In this regard, Plaintiffs draw the Court's attention to two statutes.  First, Plaintiffs point to section 463(c) of the PPIA, which states that, in PPIA rulemakings, "an opportunity for the oral presentation of views shall be accorded all interested persons[,]"  21 U.S.C. § 463(c), and Plaintiffs argue that "there was no opportunity for interested parties, including [FWW, Sowerwine, and Foran], to verbally express their opinions on the NPIS proposed rules[.]"  (Pls.' Mot. at 44.)  Second, Plaintiffs highlight section 553(b) of the APA, which states that an agency's published notice must state "either the terms or substance of the proposed rule or a description of the subjects and issues involved."  5 U.S.C. § 553(b)(3).   The D.C. Circuit has interpreted the APA's notice provision to mean that "an agency's proposed rule and its final rule may differ only insofar as the latter is a 'logical outgrowth' of the former[,]"  *Envtl. Integrity Project v. Envtl. Prot. Agency*, 425 F.3d 992, 996 (D.C. Cir. 2005), and Plaintiffs here argue that the line speed and opt in provisions that appeared in the final NPIS rules were not a logical outgrowth of those set forth in the proposed NPIS rule such that the agency violated the APA's notice requirement.  (Pls.' Mot. at 43-48).  According to

Plaintiffs, these procedural defects are sufficient to give both the individual plaintiffs and FWW procedural standing.  (*See* Pls.' Reply at 16, 28, 33-34.)

"A violation of the procedural requirements of a statute is sufficient to grant a plaintiff standing to sue, [but only if] the procedural requirement was 'designed to protect some threatened concrete interest' of the plaintiff."  *Waukesha v. Envtl. Prot. Agency*, 320 F.3d 228, 234 (D.C. Cir. 2003) (quoting *Defenders of Wildlife*, 504 U.S. at 573 n.8)); *see Fla. Audubon Soc'y*, 94 F.3d at 668-69 ("[T]he showing of injury necessary to determine whether a procedural-rights plaintiff has standing is not satisfied by the existence of a mere procedural violation, it also requires a 'particularized injury' resulting from the government's substantive action that breached the procedural requirement.").  Indeed, the Supreme Court has stated that "[w]e do not hold that an individual cannot enforce procedural rights; he assuredly can, so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing."  *Defenders of Wildlife*, 504 U.S. at 573 n. 8.

This means that, in order to establish that Plaintiffs here have standing on the basis of the alleged procedural violations, "Plaintiffs must show *both* that the defendant omitted a required procedure *and* that it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest."  *St. Croix Chippewa Indians of Wis. v. Salazar*, 384 F. App'x 7, 8 (D.C. Cir. 2010) (internal quotation marks and citation omitted; emphasis added); *see also Int'l Bhd. of Teamsters v. Transp. Sec. Admin.*, 429 F.3d 1130, 1135 (D.C. Cir. 2005) ("[T]he mere inability to comment effectively or fully, in and of itself, does not establish an actual injury." (internal quotation marks and citations omitted)).  Courts often interpret this

requirement as mandating that the alleged procedural violation cause a substantive injury to the plaintiff.   Thus, "[t]here are at least two links in an adequate causal chain between a procedural violation and injury-in-fact, one connecting the omitted procedure to some substantive government decision that may have been wrongly decided because of the lack of the procedure[,] and one connecting that substantive decision to the plaintiff's particularized injury." *Waukesha*, 320 F.3d at 234 (internal quotation marks and alterations omitted) (quoting *Fla. Audubon Soc'y*, 94 F.3d at 668); *see also, e.g.*, *Massachusetts v. Envtl. Prot. Agency*, 549 U.S. 497, 522-26 (2007) (holding that, where a state had a property interest in coastal property affected by global warming and the EPA would be more likely to take steps to regulate carbon dioxide if it were to initiate plaintiff's desired proceedings, the state had procedural standing to challenge EPA's failure to initiate rulemaking proceedings related to the regulation of greenhouse gas emissions); *Dania Beach v. FAA*, 485 F.3d 1181, 1184, 1186 (D.C. Cir. 2007) (holding that a person who lived near an airport had procedural standing to seek review of a Federal Aviation Administration (FAA) decision to change runway use without performing the environmental assessment required by the National Environmental Policy Act (NEPA) because plaintiff had "adequately demonstrated that the FAA's failure to follow the NEPA procedures pose[d] a distinct risk to [plaintiff's] particularized interests given the location of his home"); *Waukesha*, 320 F.3d at 234-235 (holding that a city had procedural standing to protest the EPA's failure to undertake a required cost-benefit analysis before the agency set standards for radionuclide levels in public water systems because the city showed that the omission of a cost-benefit analysis may have affected the standards used, and the city also

showed that its injury—costly water treatment—was fairly traceable to the agency action in setting the standard).

Thus, even if this Court assumes that the FSIS failed to permit the oral presentation of views and/or adequate notice, Plaintiffs must still show that (1) these procedural defects meant that the agency did not receive information that could have affected the agency's decision to promulgate the NPIS, and (2) Sowerwine, Foran, and FWW are "uniquely susceptible to injury resulting from" the NPIS rule.  *Dania Beach*, 485 F.3d at 1186.  Neither of these required links in the causation chain have been made clear to the Court, nor could they be on the instant record.

First of all, there is no serious dispute that these plaintiffs did, in fact, comment on the FSIS.  FWW submitted extensive written comments with respect to the proposed rule and Sowerwine and Foran signed a petition urging the agency not to adopt the NPIS.  (*See* Lovera Decl. at ¶4; Sowerwine Decl. ¶ 6; Foran Decl. ¶ 8.)  And although there was no opportunity to comment on the slightly slower line speed and opt-in provision that the agency ultimately adopted when it promulgated the NPIS, it cannot seriously be argued that Plaintiffs were harmed by the missed opportunity given that the final rule was altered to be *more favorable* to Plaintiffs' position than the proposed rule.

Second, with respect to the required substantive injury, Plaintiffs have not demonstrated that their inability to comment harmed their substantive interests in any respect, and as this Court has already explained, Plaintiffs have not identified any cognizable injury to the particularized interests of these plaintiffs *at all*, much less an injury that was caused by the FSIS's alleged violation of these two procedural rules when it promulgated the NPIS.  Thus, this Court need not reach the question of whether

or not the agency actually followed the procedural requirements of the PPIA and the APA; regardless, Plaintiffs have not shown that they have suffered a particularized injury that is fairly traceable to the Defendants' alleged failure to satisfy all of the procedural requirements. *See Nat'l Ass'n of Home Builders v. Envtl. Prot. Agency*, 667 F.3d 6, 15 (D.C. Cir. 2011)(explaining that "the requirement of injury[-]in[-] fact is a hard floor of Article III jurisdiction that cannot be removed by statute," and that "[w]ithout an imminent threat of injury traceable to the challenged action, that floor stands as a ceiling" (citation omitted)); *see also United States v. AVX Corp.*, 962 F.2d 108, 119 (1st Cir. 1992)("There is nothing talismanic about the phrase 'procedural harm.' A party claiming under that rubric is not relieved from compliance with the actual injury requirement for standing.").

## IV.    CONCLUSION

"A party who would complain that agency action has violated the Constitution, a statute, or a regulation, must be adversely affected by that action." *Capital Legal Found. v. Commodity Credit Corp.*, 711 F.2d 253, 258 (D.C. Cir. 1983). Although individual plaintiffs Sowerwine and Foran, and organizational plaintiff FWW here fervently allege that the FSIS's adoption of the NPIS violates the PPIA and threatens harm to the poultry-consuming public, they have failed to demonstrate that they have suffered a cognizable injury-in-fact; therefore, these plaintiffs have no standing, and this Court has no authority to reach the merits of their case, much less rule on their motion for a preliminary injunction. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) ("If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so."). Consequently,

as the accompanying order states, this Court must **DISMISS** Plaintiffs' case, including its motion for a preliminary injunction, on the basis of lack of subject-matter jurisdiction.


DATE:  February 9, 2015                     *Ketanji Brown Jackson*
                                            KETANJI BROWN JACKSON
                                            United States District Judge